## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**EDDIE W. MILLER,**
      **Plaintiff,**

v.

                                      **CIVIL ACTION NO. 1:06CV176**
                                      **(Judge Keeley)**

**MICHAEL J. ASTRUE,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

Eddie W. Miller ("Plaintiff") filed his application for DIB on September 17, 2003, alleging

disability as of January 14, 2003, due to a wrist injury, diabetes, back problems, a sleep disorder,

depression, and nervousness (R. 61, 77). The application was denied initially and on reconsideration

(R. 30, 37). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Robert C. Allen

held on April 22, 2003 (R. 278). Plaintiff, who was represented, testified along with Vocational

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

Expert Kelly Hutchins ("VE"). The ALJ rendered a decision on January 9, 2006, finding that Plaintiff could perform his past relevant work as a security guard and was therefore not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (R. 23). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6).

## II. Statement of Facts

Plaintiff was born on July 12, 1949, and was 56 years old on the date of the ALJ's decision (R. 17). He went to school until the sixth grade, and later acquired his GED. He has past work as a maintenance man from 1997 until he last worked in January 2003; as a truck driver from 1995 until 1997; as a casino security guard from 1991 through 1994; and as a maintenance man from 1983 through 1990 (R. 78). Plaintiff lost his most recent job, as an apartment maintenance man, when he injured his right (dominant) wrist and underwent fusion surgery. The ALJ found the Plaintiff could perform his past work as a security guard.

On December 5, 1994, Plaintiff presented to the North Shore Psychiatric Hospital with a chief complaint of being depressed and suicidal with multiple suicide attempts (R. 148). He was, at the time, a security guard at a casino (this is the past work which the ALJ opined Plaintiff could perform). Plaintiff indicated he was extremely depressed over an affair his wife of 20 years was having. Three months earlier she had thrown him out of the house. He got into a physical altercation with her boyfriend over Thanksgiving, ending up with three cracked ribs. He had been off work ever since.

Three weeks before his hospitalization, Plaintiff had consumed two fifths of vodka and awakened on the beach not knowing how he had gotten there. He began going to counseling at that

time, and the counselor recommended he get more intensive therapy because of the severity of his symptoms (R. 148). Plaintiff also reported an incident of putting a loaded gun to his head. He said he constantly prayed that the Lord would "take him."

Plaintiff reported he either did not sleep at all or he slept all the time. He had no appetite and reported having lost 50 pounds in the past three months. He had frequent crying spells, poor concentration, poor interest, and an overwhelming feeling of hopelessness.

Upon Mental Status Examination, Plaintiff appeared severely depressed and in severe distress (R. 149). He was noted to be mildly obese. He was casually dressed and adequately groomed. His affect was depressed with marginal eye contact. He was very lethargic, and speech was severely decreased in intonation and markedly decreased in volume with little or no spontaneity. His mood was profoundly depressed and despairing, with an undercurrent of anger and high levels of anxiety. His thought processes were goal directed but mildly slowed. He was fully oriented and able to perform abstracts, and was able to remember six numbers forward and three backward. His judgment was considered marginal to very poor. His intelligence appeared to approach average.

Plaintiff was diagnosed with Major Depression and Panic Disorder (R. 149). He was admitted to the hospital and prescribed Zoloft. His estimated length of stay was two to three weeks. Fortunately, it was reported he had stable employment with a supportive employer, and willingness and motivation for treatment.

Plaintiff was discharged from the psychiatric hospital on January 3, 1995 (R. 141). His discharge diagnosis remained Major Depression and Panic Disorder. Upon mental status examination on that date his appearance and attitude were still severely depressed, with low speech and marginal eye contact. His affect was of depression, despair, and anger. He was fully oriented

and goal directed, however. Plaintiff was found to have improved "just a bit" from being in the hospital. He was still having difficulty sleeping and had frequent crying spells, but was able to list two reasons for living, realizing he needed to be alive for his children. His affect had begun to brighten. He had at first still felt homicidal and felt he would "absolutely act on his plan and that he want[ed] to kill his wife and her boyfriend." He talked about how he would kill them. He continued to be a danger to others. By the end of his admission, however, Plaintiff said he no longer felt homicidal, just angry. He said he was feeling a lot better and his sleep had improved. He said he would not kill his wife, because of the children. His hopefulness was much improved and his crying spells were rare. He was ready to transfer to outpatient therapy.

Plaintiff was discharged with prescriptions for Zoloft, Desyrel, BuSpar, and Ativan (R. 142). He could resume normal activities and return to work. His condition was "Improved" and his prognosis was "Fair." He continued to be diagnosed with Major Depression and Panic Disorder.

Two weeks later, Plaintiff was readmitted to the psychiatric hospital after an ill-fated attempt at reconciliation with his wife (R. 162). He reported giving her $700.00, then drinking vodka and taking all his Ativan. He wrote a suicide note. He ended up in the emergency room. Once admitted to the psychiatric hospital he denied depression and suicidal ideation. He had gained eight pounds and his energy level was okay. He said his concentration was also okay. His general interest was fair with no psychotic symptoms. The psychiatrist found Plaintiff had a severely disabling dysphoric mood, moderately disabling weight gain, and a severely disabling withdrawal from family and friends.

Upon Mental Status Examination, Plaintiff was very depressed, but he had a cooperative attitude and normal eye contact and speech. He was admitted. He stated he had no memory of the

events leading up to his admission.

Plaintiff spent about a week in the psychiatric hospital on this occasion, gradually beginning to improve (R. 162). His affect was deemed "mildly peculiar." His sleep and appetite improved and he denied crying spells or suicidal ideation. He began to dress and groom himself neatly. Upon discharge he was in good spirits and his mood was much brighter with minimal residual depression or anxiety. He was no longer considered a danger to himself or others. He was prescribed Zoloft, Buspar, and Antabuse for his own protection. He was diagnosed with Depression, NOS and Alcohol Dependence.

At some point during 1998, Plaintiff was diagnosed with non-insulin dependent diabetes mellitus (R. 186).

On September 17, 1998, Plaintiff presented to neurologist Harry Danielson, M.D., upon referral of his regular physician, Dr. Donald Rayer, for a neurological consultation (R. 259). His primary complaints were neck and back pain. Plaintiff told Dr. Danielson he had been injured in February 1998, when he was hit by a truck while walking. He did not go to the hospital at the time.

Upon examination, Plaintiff had hypoactive patellar reflexes bilaterally, and Achilles reflexes 2+ bilaterally (R. 260). He had decreased sensory at the S1 level on the left. Straight leg raising was positive at 40 degrees right and 60 degrees left. Range of motion was mildly restricted in his neck and back. Dr. Danielson opined Plaintiff's lumbar MRI showed "some disc trouble at L5/S1." His cervical MRI showed "mild posterior osteophytes at C3/4 through C5/6 with no significant spinal stenosis or evidence of disc herniation." Dr. Danielson found there was no acute abnormality. He diagnosed "Disc trouble at L5/S1; mild posterior osteophytes at C3/4 through C5/6 with no significant spinal stenosis or evidence of disc herniation; and soft tissue mass over the left lower

neck which may be related to enlargement of left lobe of thyroid gland."

On September 14, 2000, Plaintiff presented to Cyril Bethala, MD, for complaints of chest pain (R. 186). He also complained of palpitations, especially when he did heavy work at his job as a maintenance man. Plaintiff underwent an exercise stress test which was stopped after six minutes due to increased shortness of breath and fatigue (R. 190). It appeared normal, but was sub-maximal, so the doctor scheduled a thallium stress test. The thallium stress test was "essentially normal" with normal left ventricular ejection fraction and an ejection fraction of 61% (R. 201).

At some point in 2001, Plaintiff injured his right wrist while working his maintenance job (R. 211). He was diagnosed with a scapholunate advanced collapsed ("SLAC") wrist.

Plaintiff underwent scaphoid removal and four-bone fusion of his right wrist on January 14, 2003, for his SLAC wrist (R. 211). It was performed by orthopedic surgeon Carl F. Palumbo. Before the operation, he had limited range of motion of the wrist, obvious synovitis and swelling, and tenderness over the wrist. X-rays confirmed a stage II SLAC wrist with narrowing of the entire elliptical fossa of the radius.

Plaintiff presented to Rafaat Shabti MD on January 25, 2003, for complaints of sore throat, gas, and GERD (R. 256). He was diagnosed with an upper respiratory infection, obesity, and GERD.

On January 29, 2003, Plaintiff followed up with Dr. Palumbo regarding his wrist surgery two weeks earlier (R. 269). He was placed in a total spica cast two days earlier. Dr. Palumbo noted that Plaintiff was "a quite anxious gentleman and somewhat claustrophobic. He really is having a hard time with the cast as it is quite confining." Dr. Palumbo had "a long discussion with him today about the necessity of the cast," advising if it was removed, "it may compromise the partial fusion of his wrist." Dr. Palumbo advised Plaintiff to speak with his primary care physicians "to see if they can

6

increase his anxiety medication." If this did not help or if his primary doctors would not increase his anxiety medication, alternatives to the cast would be discussed.

The next day, Plaintiff returned to Dr. Palumbo because he "really does not want to have the cast on his right wrist" (R. 268). He said his wrist hurt more since the cast was put on. Dr. Palumbo again strongly advised against removing the cast, but again noted that Plaintiff was "quite claustrophobic and really cannot keep the cast on." The cast was therefore removed. Upon examination, there was minimal edema, sensation was normal, and the incision was healing well.

On February 24, 2003, Plaintiff followed up with Dr. Palumbo regarding his wrist fusion (R. 265). He was six weeks post surgery. He was wearing a removable splint and was working on hand therapy on range of motion and strengthening. He had no complaints. The incision was well healed. There was mild swelling. Sensation was intact. Wrist range of motion was decreased. X-rays showed some frozenness consistent with some consolidation of the fusion. Plaintiff was to remain off work for at least six more weeks.

On April 7, 2003, Plaintiff presented to Dr. Palumbo for follow up of his wrist surgery (R. 270). Plaintiff was making slow progress with therapy, but stated his pain was much better since the surgery. On examination, the incision was well healed, but Plaintiff still had some mild swelling in his fingers and over the wrist. Range of motion was 30 flexion and 30 extension. The 4-bone arthrodesis was "nicely fused." Dr. Palumbo released Plaintiff back to light work duty, stating he must refrain from lifting greater than five pounds or any repetitive motion.

On July 7, 2003, Plaintiff presented to Dr. Palumbo for his final workers' compensation visit (R. 211). He still had some pain in his wrist, but described it as a 2 out of 10. Dr. Palumbo opined that Plaintiff had reached maximal medical improvement, with an impairment rating of 10%, due

to his limited wrist motion. Dr. Palumbo opined:

> He will have permanent work restrictions. He was unable to lift more than 5 pounds, unable to use any heavy equipment or vibratory equipment, unable to do any torquing or gripping with his right hand.

> In the future if his arthritis in his wrist progresses, he may need further medical management consisting of splinting, anti-inflammatories, or steroid injections. If his pain worsens and his arthritis progresses, then he may need a total wrist fusion . . .

(R. 211).

On August 26, 2003, Plaintiff presented to Dr. Shabti for complaints of cough and residuals of wrist surgery (R. 255). He was diagnosed with GERD, diabetes, wrist pain with decreased range of motion, and cough/bronchitis.

On September 21, 2003, Plaintiff followed up with Dr. Palumbo regarding his wrist surgery (R. 264). Plaintiff wanted to settle with his employer/workers' compensation, but had some questions regarding future medical treatment. He still had pain and was still wearing a wrist splint. Upon examination, he had significant guarding. Range of motion stayed at 30 degrees extension and flexion. Dr. Palumbo wanted Plaintiff to stop using the wrist splint and start using his wrist and hand in a normal fashion. He was provided with work restrictions, but said he was applying for disability.

On November 17, 2003, Plaintiff was examined by Warren Wright, MD, for the State agency (R. 218). His allegations were pain in the back and wrist, diabetes, and a sleep disorder. Plaintiff was currently taking Zoloft, Protonix, Avandia, Lorazepam, Klonopin, Percocet, Trazadone, and Monopril, besides two others the transcriptionist left "blank" as unintelligible. Upon physical examination, Plaintiff was 5'10" and weighed 247 pounds. His blood pressure was 134/84. There were no obvious mental aberrations. His range of motion was normal except for his right upper arm,

which had marked limitation, especially at the shoulder. His back had no appreciable spasm or deformity, and range of motion was normal. Plaintiff had a natural gait. Heel and toe walking were normal. Squat was about three-quarters. Motor functioning was normal and grip was 4+ bilaterally. Straight leg raising was negative. Fine and gross manipulation were within normal limits.

On November 20, 2003, Plaintiff presented to Dr. Shabti for complaints of sinusitis (R. 254).

On December 2, 2003, a State agency reviewing physician completed a Physical Residual Functional Capacity Assessment ("RFC"), finding Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, sit about six hours in an eight-hour workday, and stand/walk about six hours in an eight-hour workday (R. 222). He could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and could frequently perform all other posturals. His reaching was limited in all directions, but his manipulation was otherwise unlimited.

Plaintiff presented to Dr. Shabti on January 5, 2004, for complaints of GERD, restless leg syndrome, and his diabetes (R. 253). The doctor noted Plaintiff was non-compliant with his Glucovance for diabetes, not taking it enough times per day. Dr. Shabti diagnosed diabetes, non-compliant, obesity, mild bilateral neuropathy, and GERD.

On January 14, 2004, Plaintiff underwent a psychological consultation performed by J.D. Matherne, Ph.D., at the request of the State agency (R. 230). Plaintiff's prescribed medications included Bextra, Flomax, Ultram, Protonix, Elavil, Avandia, Glucovance, Zoloft, Soma, Reglan, and Ativan.

Plaintiff stated he woke up around 8:00 a.m., ate breakfast prepared by his wife (of one year); sometimes visited with his wife at the apartment complex she managed; watched television; ate lunch prepared by his wife; sat outside; ate supper prepared by his wife; and had a bath and went to

bed around 11 p.m. His primary interest was "sitting outside." He had a driver's license. His wife did the laundry, housework, and grocery shopping.

Upon mental status examination, Dr. Matherne found Plaintiff's grooming average; gait and posture normal; eye contact appropriate; activity level within normal limits; and speech normal. Dr. Matherne stated:

> He is a somewhat anxious individual. He indicates that he suffers from anxiety because of pain-related problems and is also anxious because of his inability to work. He is also significantly depressed. He states that he is depressed because of his inability to work. He has a problem with anger and resentment.

Plaintiff acknowledged a history of DT's and alcoholic blackouts. His last use of alcohol was three years ago and he was last intoxicated six years ago.

Dr. Matherne noted that Plaintiff was "on a rather significant amount of medication, including psychotropic medication." He further found:

> Mental status examination reveals that the claimant is an alert and fully oriented individual. He suffers from significant depression. He has a history of suicidal gesture.

> He did engage in significant situational alcohol abuse but has been maintaining his sobriety for the past several years. He has fair concentration and attention span. He is viewed as an individual of perhaps average intelligence.

> The prognosis is that he will continue to function in the same or similar manner over the next twelve months. He does have the capability of assuming responsibility for the management of disability benefits if so assigned. He appears to be moderately impaired in his ability to perform routine, repetitive tasks. He is moderately impaired in his ability to interact with coworkers and supervisors.

(R. 234). Dr. Matherne also stated:

> The claimant is able to perform routine hygiene and grooming activities on an independent basis. He does have a current driver's license. He does posses basic communication and social skills, which allow him to interact with others.

(R. 234).

Dr. Matherne diagnosed Major Depressive Disorder, recurrent without psychosis; Anxiety Disorder; Alcohol Abuse, episodic in remission by history; and Mixed Personality Disorder (R. 234).

On February 14, 2004, Thomas Conger, Ph.D. a State agency reviewing psychologist completed a Psychiatric Review Technique ("PRT"), opining that Plaintiff had no severe mental impairment (R. 236). He did find Plaintiff had a Depressive Disorder, NOS, Anxiety Disorder, NOS, and a Substance Addiction Disorder, but that these caused only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. He had had no episodes of decompensation, each of extended duration (R. 246). Dr. Conger concluded as follows:

> The claimant is limited by his physical condition and pain to some extent but he showed the mental ability to perform routine ADL's within his physical limitations. He does have a history of multiple psychiatric hospitalizations during the mid-90's related to depression and suicidal behavior/ideation. However, he improved with treatment and maintained SGA employment over several years subsequent to his last hospitalization. He continues to demonstrate some depression and anxiety but he remains fully functional from a mental perspective. He is also able to relate in a socially appropriate manner and does not have a severe mental impairment at this time.

(R. 248).

On March 30, 2004, Plaintiff presented to Dr. Shabti for followup (R. 252). His diabetes was improved, with no numbness; his GERD was better; and his back pain was being treated by Dr. Danielson. Plaintiff complained of leg pain , worse when supine and better when walking. He was diagnosed with diabetes, lower extremity neuropathy and GERD.

On April 28, 2004, Plaintiff presented to Taylor Community Health Center for follow up of his Diabetes, GERD, osteoarthritis, diabetic neuropathy, depression, anxiety, prostate hypertrophy, high cholesterol, status post wrist fusion, "disc problems," depression, and anxiety (R. 281). His

medications were listed as Reglan, Prevacid, Flomax, Zoloft, Lortab, Avandia, Glucovance, Zocor, and Klonopin. He was not on Neurontin or Ativan at that time (R. 280). He also complained of cold symptoms. He told the physician he needed to become established as a patient as he was moving from Biloxi where he had been displaced due to hurricane Katrina. Plaintiff was diagnosed with an upper respiratory infection.

On June 15, 2004, Plaintiff presented to Dr. Shabti for complaints of back pain; jerking and shaking in his sleep; urinary frequency; and follow up of his wrist surgery (R. 251). Dr. Shabti diagnosed mild chronic back pain, diabetic neuropathy, and right wrist pain.

On October 19, 2004, Plaintiff followed up with Dr. Shabti regarding his diabetes (R. 285). It was noted his back pain was treated by Dr. Danielson, and he had been prescribed Tylenol 3. He complained of frequent urination, and his legs jerking. He was diagnosed with diabetes, back pain, leg neuropathy, osteoarthritis, prostatic hypertrophy, and GERD.

On February 17, 2005, Plaintiff followed up with Dr. Shabti regarding his diabetes, severe pain in legs, anxiety, panic attacks, and left finger swelling (R. 283).

On March 14, 2005, Plaintiff followed up with Dr. Shabti regarding his worsening anxiety, cough and post nasal drip, tremor, and diabetes (R. 282). He was diagnosed with anxiety, suicidal thoughts, and an upper respiratory infection.

On September 27, 2005, Plaintiff followed up with the Taylor Community Health Center for a refill of his medications and for complaints of a swollen left ring finger, a rash, and his back and wrist problems (R. 277). Plaintiff had no patellar or Achilles reflexes that could be distinguished and he had "very very minimal distinction" of his legs. He was diagnosed with diabetes, seborrhea, depression/anxiety, GERD, and high blood pressure. He was given prescriptions for Zoloft,

Flomax, Ativan, and Keflex.

On October 5, 2005, Plaintiff followed up with the Community Health Center (R. 274), seeing Mark Witkowski, MD. The doctor found that Plaintiff did need prescriptions for chronic narcotics due to chronic low back pain occasionally radiating down both legs. He also reported paresthesia in his legs, but because he had diabetes, the doctor opined this condition was a result of diabetic neuropathy. Plaintiff said Lortab was effective in controlling the pain. He also had problems with anxiety and was taking both Klonopin and Ativan. He felt the Ativan worked better. He also had a history of diabetes, GERD, osteoarthritis, prostatic hypertrophy, and anxiety and depression. He was taking all his medications as prescribed. The doctor was going to try to obtain his medications through the indigent drug program.

Upon examination, Plaintiff weighed 246 pounds. Patellar and ankle reflexes were absent. Sensation in the feet was absent. Back was nontender with no spasm or swelling noted. He had full range of motion, but some problem lying flat on the examining table. Straight leg raising was positive on the left at 20 degrees and on the right at 30 degrees. Dr. Witkowski diagnosed chronic low back pain, anxiety, diabetes, and questionable history of hypothyroidism.

On October 20, 2005, Plaintiff presented to Dr. Witkowski with complaints of pain in his ears, sinus congestion, and runny nose with mild cough (R. 273). He was having problems with bruising and bleeding. He was suffering from more anxiety than usual and was very jumpy and not sleeping very well. Upon examination, Plaintiff still weighed 246 pounds. He did have a number of large bruises, but no bleeding at the time. He was diagnosed with sinusitis, ecchymosis, and increasing anxiety.

On November 9, 2005, Plaintiff presented to Dr. Witkowski's office for refills of his

medications because he needed to return to Mississippi for his disability hearing (R. 271). He still did not feel better, and was very shaky, stating sometimes his wife had to guide food to his mouth when he was eating. He also reported more panic attacks. The medication was not helping. His blood sugar was stabilizing on medication. He felt the Lortab was not helping as much as Percocet had. He felt very nervous, and his wife stated "his paranoia is very severe [in] that he has changed the locks at the house and reminds her to lock the door but now he's even asking her to lock the bedroom door and he's never done this before."

The doctor noted that Plaintiff was "noticeably more nervous today than he was when I saw him for the first time a couple months ago. His hands visibly shake and he's almost talking in a child like manner when he talks about feeling nervous or being out in a crowds and wants to go back to the car and sit while his wife goes in. He's talking in a child like tone which is different than he did before. He is still appropriate. Well groomed and is [alert and oriented]" (R. 271). Plaintiff was diagnosed with sinusitis, chronic anxiety – worsening, and chronic pain. His Zoloft was increased, his Lortab was increased, and his Klonopin was increased.

At the Administrative Hearing held on November 17, 2005, the ALJ asked the Vocational Expert ("VE") about Plaintiff's past relevant work (R. 307). The VE testified that Plaintiff's apartment maintenance work was at the medium level, his truck driving job was at the medium level, and his security guard job was at the light level.

The ALJ then asked the VE a hypothetical with a medium exertional level, occasional climbing, occasional overhead reaching with the right arm, and occasional gross and fine manipulation with the right hand. The VE testified the hypothetical person could perform Plaintiff's past relevant jobs of truck driver at the medium level and security guard at the light level (R. 308).

There would be transferable skills to the medium and light level, but not to the sedentary. There was no past relevant work at the sedentary level. In fact, as the ALJ determined during the hearing, if limited to sedentary work, Defendant would be disabled according to the Grid Rules (R. 309). There were no further questions or hypotheticals.

## EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

On April 11, 2006, Plaintiff submitted to the Appeals Council a letter from Dr. Witkowski stating as follows:

> The above patient, Eddie Miller, Sr., has been coming to me since being displaced from Mississippi with the recent hurricane problems. He suffers from multiple medical problems, among them DM Type II, GERD, osteoarthritis, questionable diabetic gastroparesis, diabetic neuropathy, he is s/p (R) wrist surgery. He had a 4 bone fusion and radical styloidectomy. He also suffers from chronic low back pain after a car accident in the past.

> At this time, I am still trying to get records from Mississippi regarding this patient. He has had increasing problems with depression and anxiety related to his illnesses and the fact that he was displaced from Mississippi. He is currently trying to obtain social security disability. At this time I feel the patient is not able to be gainfully employed secondary to his multiple medical problems.

(R. 288).

Plaintiff also submitted an "Application for Parking for Person with a Disability" signed by Dr. Witkowski on January 12, 2006, certifying and affirming that, in his professional opinion, Plaintiff's ability to walk was permanently severely limited due to arthritic and neurological conditions (R. 289).

Finally, Plaintiff submitted copies of his prescriptions for Percocet (R. 290-292).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's status-post right wrist fusion, anxiety, diabetic neuropathy, and arthritis are "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c)(2005).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to lift/carry no more than 20 pounds occasionally, and 10 pounds frequently. The claimant can stand for 6 hours in an 8 hour workday, and sit for 6 hours in an 8 hour workday. His ability to push and/or pull including operation of foot and hand controls is unlimited, other than as shown for lifting/carrying above. The clamant [sic] does not have any postural limitations, other than that he can only occasionally climb ramps, stairs, ladders, ropes, or scaffolds. He is limited to occasional overhead reaching with his right upper extremity, and occasional fine or gross manipulation with his right hand, but has no other manipulative limitations. He has no visual limitations, communicative limitations, or environmental limitations. He has a mild restriction in his ability to maintain concentration and attention due to anxiety and slight to moderate pain.

7.  The claimant's past relevant work as a security guard did not require the performance of work-related activities precluded by his residual functional capacity. 20 CFR § 404.1565 (2005).

8.  The claimant's medically determinable status-post right wrist fusion, anxiety, diabetic neuropathy, and arthritis do not prevent the claimant from performing his past relevant work.

9.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(R. 24).

# IV. DISCUSSION
## A. Scope of Review

As a threshold matter, the undersigned United States Magistrate Judge notes that this claim was decided at the administrative level in Mississippi, where Plaintiff resided prior to his being displaced due to Hurricane Katrina. Plaintiff even returned to Mississippi for his administrative hearing, and the ALJ deciding the claim is based in Biloxi. Although both parties cite Fourth Circuit law, the undersigned finds that Fifth Circuit law applies in this matter. There is no substantive effect on the decision, however, as the relevant law in both circuits is substantially similar if not identical.

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence. Martinez v. Chater, 64 F.3d 172 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Villa v. Sullivan, 895 F.2d 1019, 1021-22) (5th Cir. 1990). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Abshire v. Bowen, 848 F.2d 638, 640 (5th Cir. 1988).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. Martinez, 64 F.3d at 173. In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner. Id. Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## B. Contentions of the Parties

Plaintiff contends:

The ALJ's Residual Functional Capacity assessment is not supported by substantial evidence because the ALJ issued an under-analyzed, under-developed decision which failed to fully evaluate all the relevant evidence as required by the Regulations and well-established Fourth Circuit case law.

      A.      The ALJ failed to evaluate all the relevant evidence by failing to make a step two severity finding regarding Mr. Miller's low back pain; and

      B.      The ALJ failed to evaluate all the relevant evidence by failing to properly analyze and weigh the opinions of treating physician Dr. Carl Palumbo and consultative physician Dr. J.D. Matherne.

Defendant contends:

Substantial evidence supports ALJ's finding of light work.

      A.      Plaintiff's back impairment is not a severe impairment; and

      B.      The ALJ properly analyzed the findings of Drs. Palumbo and Matherne.

## C. Severe Impairments

Plaintiff argues that the ALJ failed to evaluate all the relevant evidence by failing to make a step two severity finding regarding Mr. Miller's low back pain. Defendant contends Plaintiff's back impairment is not a severe impairment. At step two of the sequential evaluation, Plaintiff bears the burden of production and proof that he had a severe impairment. Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985). To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). The Fifth Circuit construes the regulation as setting the following standard in determining whether a claimant's impairment is severe as follows:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

Id. at 1101. In Plaintiff's case, the ALJ did not find that Plaintiff's back impairment was severe. Neither, however, did he refer to it as one of the "non-severe" impairments (in this case, hypertension, questionable hypothyroidism, depressive disorder, and history of alcohol abuse in apparent remission). The undersigned finds this omission alone requires remand in this matter. Even if Plaintiff's back impairment is not severe, it is arguably a medically-determinable impairment. The ALJ himself noted Dr. Danielson's impression of Plaintiff's lumbar MRI as indicating "disc trouble" at L5-S1. As the ALJ stated, it is unfortunate that the MRI itself is not in the record, but Plaintiff's current physician, Dr. Witkowski, wrote that he was having problems getting Plaintiff's records from Mississippi. Dr. Shabti noted back pain as a diagnosis in 2004. Dr. Witkowski also treated Plaintiff for back pain, and found Plaintiff had positive straight leg raising at 20 degrees on the left and 30 degrees on the right. 42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F) provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process."

Although neither party so argued, compounding the ALJ's error in regard to Plaintiff's alleged back impairment in this matter is the fact that the ALJ did not follow the mandate of Social Security Ruling ("SSR") 00-2p, regarding obesity. Throughout the record, Plaintiff's height is

recorded as approximately 5'9 or 5'10 and his weight is upward of 245 pounds. In December 1994, Plaintiff was found to be mildly obese. In 2003, Plaintiff's treating physician, Dr. Shabti, diagnosed Plaintiff with obesity. A year later, Dr. Shabti again diagnosed obesity, along with diabetes. The ALJ did not find obesity to be a severe or even non-severe medically determinable impairment. "[I]n the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or by a consultative examiner." SSR 00-2p. The Ruling goes on as follows:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
> . . . .

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.
> . . . .

> As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.
> . . . .

> When we identify obesity as a medically determinable impairment (see question 4, above), we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify.

The ALJ's failure to identify and discuss obesity in the decision is therefore reversible error, especially considering Plaintiff's identified severe impairments of diabetic neuropathy and arthritis, as well as his complaints of back pain and trouble sleeping.

The undersigned therefore finds substantial evidence does not support the ALJ's

determination at Step Two of the sequential evaluation, regarding Plaintiff's severe, non-severe and medically-determinable impairments.

### D. Opinion Evidence
### 1. Right Wrist Impairment

Plaintiff next argues: The ALJ failed to evaluate all the relevant evidence by failing to properly analyze and weigh the opinions of treating physician Dr. Carl Palumbo and consultative physician Dr. J.D. Matherne. Defendant contends the ALJ properly weighed Dr. Palumbo's and Dr. Matherne's opinions. 20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.
>
> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

> (3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

> (4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Dr. Palumbo performed the surgery on Plaintiff's wrist. The ALJ did find Plaintiff's status-post right wrist fusion to be a "severe" impairment. The ALJ also quoted Dr. Palumbo's opinion stating:

> [Plaintiff] will have permanent work restrictions. He was unable to lift more than 5 pounds, unable to use any heavy equipment or vibratory equipment, unable to do any torquing or gripping with his right hand.

The ALJ did not follow the requirements of §404.1527. He did not indicate what weight he accorded Dr. Palumbo's "permanent work restrictions." He did find Plaintiff's wrist impairment severe, but then limited him to lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently. He also found he had an unlimited ability (up to the lifting/carrying limits) to push and pull including

22

using hand controls, and he could occasionally reach overhead and perform fine or gross manipulation with the right hand. The undersigned does not find these restrictions consistent with those "permanent" restrictions set by Dr. Palumbo. It may well be that Plaintiff does not have those restrictions any longer, but, because the ALJ did not state what weight, if any, he accorded Dr. Palumbo's opinion, the court cannot determine whether substantial evidence supports that determination.

## 2. Mental Impairments

On January 14, 2004, Plaintiff underwent a psychological consultation performed by J.D. Matherne, Ph.D., at the request of the State agency (R. 230). Dr. Matherne noted that Plaintiff was "on a rather significant amount of medication, including psychotropic medication." He further found:

> Mental status examination reveals that the claimant is an alert and fully oriented individual. He suffers from significant depression. He has a history of suicidal gesture.

> He did engage in significant situational alcohol abuse but has been maintaining his sobriety for the past several years. He has fair concentration and attention span. He is viewed as an individual of perhaps average intelligence.

> The prognosis is that he will continue to function in the same or similar manner over the next twelve months. He does have the capability of assuming responsibility for the management of disability benefits if so assigned. He appears to be moderately impaired in his ability to perform routine, repetitive tasks. He is moderately impaired in his ability to interact with coworkers and supervisors.

(R. 234).

Dr. Matherne diagnosed Major Depressive Disorder, recurrent without psychosis; Anxiety Disorder; Alcohol Abuse, episodic in remission by history; and Mixed Personality Disorder (R. 234).

On February 14, 2004, Thomas Conger, Ph.D. a State agency reviewing psychologist

completed a Psychiatric Review Technique ("PRT"), opining that Plaintiff had no severe mental impairment (R. 236). He did find Plaintiff had a Depressive Disorder, NOS, Anxiety Disorder, NOS, and a Substance Addiction Disorder, but also found that these impairments caused only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. He found Plaintiff had had no episodes of decompensation, each of extended duration (R. 246).

The ALJ quoted some of Dr. Matherne's report, but did not include any of his functional limitations, including that Plaintiff would be "moderately impaired in his ability to interact with co-workers and supervisors [and] moderately impaired in his ability to perform routine, repetitive tasks." Again, he did not follow the requirements of § 404.1527 regarding Dr. Matherne, an examining psychologist's, opinion. He did not indicate what weight, if any, he accorded Dr. Matherne's opinion. He did not mention Dr. Matherne's diagnoses of Major Depressive Disorder, Recurrent without Psychosis; Anxiety Disorder; and Mixed Personality Disorder.

The ALJ then quoted Dr. Conger's determination that Plaintiff's mental impairments were "non-severe." He also expressly "agree[d] with the functional limitations determined by Dr. Conger, and f[ound] that the claimant's mental impairments result in a mild restriction of daily living; a mild difficulty in maintaining social functioning; a mild difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation."

The undersigned finds the ALJ's evaluation of Plaintiff's alleged mental impairments flawed in several respects. First, he does not indicate the weight he accorded Dr. Matherne, an examining psychologist's, opinion. Second, although he agreed with reviewing psychologist Dr. Conger's opinion regarding Plaintiff's functional limitations, the ALJ found Plaintiff's anxiety to be a severe

24

impairment, which is inconsistent with both Dr. Conger's findings regarding severity and with his finding that Plaintiff would have only mild limitations.

Finally, the ALJ's determination that Plaintiff could perform his past work as a security guard is not in compliance with the regulations. As the Fifth Circuit held:

> [W]hen making a finding that an applicant can return to his prior work, the ALJ must directly compare the applicant's remaining functional capacities with the physical and mental demands of his previous work. 20 C.F.R. § 404.1520(e)(1994). He must make clear factual findings on the issue. *See Abshire v. Bowen*, 848 F.2d 638, 641 (5th Cir. 1988). The ALJ may not rely on generic classifications of previous jobs. SSR No. 82-61.

Latham v. Shalala, 36 F.3d 482 (5th Cir. 1994). Here the ALJ determined Plaintiff could return to his past work as a security guard. His only explanation for this finding is that the security guard job was at the light exertional level and semi-skilled, and that "[t]he vocational expert further testified that assuming the claimant's age, education, past relevant work and residual functional capacity, a hypothetical person could return to the claimant's past relevant work as a security guard." The undersigned finds this analysis insufficient under the regulations and case law. This error seems more troublesome in this case, considering that Plaintiff last performed the job of security guard in 1994; Plaintiff apparently never returned to that job after being hospitalized for depression and suicide attempts; and the record indicates that Plaintiff is prescribed what Dr. Matherne referred to in 2004, as "a rather significant amount of medication, including psychotropic medication." In fact, a review of the decision does not show the ALJ considered the possible side effects of Plaintiff's medications, which also included Lortab (hydrocodone), defined as " a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effect." Dorland's Illustrated Medical Dictionary, 890 (30th ed. 2003).

25

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's evaluation of the opinion evidence in this matter, his RFC, or his ultimate determination that Plaintiff could perform his past relevant work as a security guard and was therefore not disabled.

Having determined that substantial evidence does not support the ALJ's decision in this matter, the undersigned does not reach the merits of Plaintiff's contentions regarding the new evidence submitted to the Court, that being a subsequent ALJ decision dated January 18, 2007, finding Plaintiff disabled as of January 24, 2006 (15 days after the ALJ's decision in this matter denying benefits). Upon remand, both parties shall be permitted to introduce evidence that is relevant to the time frame at issue in this claim.

## VI. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 12] be **DENIED**; Plaintiff's Motion for Summary Judgment [Docket Entry11] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation; and this case be dismissed and stricken from the Court's docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

26

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _10_ day of December, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE